SOPCHAK, Respondent, vs. KADULSKI and another, Appellants.

*November 8—December 5, 1933.*

294

*J. A. Krueger* of Marinette, attorney, and *Harold W. Krueger* of Oconto of counsel, for the appellants.

For the respondent there was a brief by *Sells & Sells* of Florence, attorneys, and *Ray E. MacAllister* of Iron

Mountain, Michigan, and *Allen C. Wittkopf* of Oconto of counsel, and oral argument by *Mr. Wittkopf* and *Mr. Arthur M. Sells.*

ROSENBERRY, C. J.   The gist of the plaintiff's action is the failure of the defendant Zaidel to warn the plaintiff with respect to the dangerous propensities of the animal in question.   Supporting this is the claim, first, that the animal was dangerous, and second, that Zaidel had knowledge thereof.   The material facts briefly stated are as follows: The defendants operate a general store in a farming community.   They had purchased from one Jenkins the animal in question, the amount of the purchase price being applied upon the amount owing to the defendants by Jenkins.   The Jenkins farm is on the north side of the village of Niagara, in which place the defendants conducted their business. Jenkins, who bred the calf, said that it was about eight months of age and from other testimony it appears to have weighed somewhere in the neighborhood of 400 pounds.

On the afternoon of the 18th day of April, 1931, Waitrovich came into the store of the defendants and according to the testimony of defendant Zaidel and Waitrovich, Waitrovich was hired to go to the Jenkins farm and take the animal in question to the Marcoulier barn for $1.   The plaintiff claims that he and Waitrovich were jointly hired and that each was to receive fifty cents.   Upon a conflict of evidence the jury found in favor of plaintiff's contention.   It is undisputed that Waitrovich and plaintiff left the store and proceeded to the Jenkins farm, Waitrovich having been given two ropes by the defendant.   When they reached the Jenkins farm they found the calf in the barn in a stanchion.   The plaintiff testified: "I stayed by the door and I never saw anything like that, ugly like that. . . . I tried to tie her with the rope.   The heifer tried to jump, it was nervous, it jumped."   Waitrovich then proceeded to

put one rope around the calf's neck and the other around the calf's nose. He drove the animal ahead of him out of the barn, at which time the plaintiff took the rope around the calf's neck, Waitrovich the rope fastened to the calf's nose, and they proceeded one on either side of the animal. They had gone about seventy-five to one hundred feet when the calf attempted to escape. Being restrained, it apparently in its struggle to escape in some way struck the plaintiff, knocked him down, as a result of which his shoulder was dislocated and he received cuts about his face. It does not appear from the testimony what part of the calf came in contact with plaintiff's person. The plaintiff says: "He (referring to the heifer) ran over me; I don't know anything about it. . . . After the heifer jumped on me I tried to get help."

It appears that Waitrovich, after the plaintiff had been knocked down, tied the heifer to a post and subsequently another person came and led the heifer to the Marcoulier barn alone. There is no evidence in the case which indicates that the heifer tried to hook, butt, or strike the plaintiff or do anything but to escape from the men who were leading her. The calf had run with its mother in the woods during the summer, had been taken up in the month of November and thereafter kept in a barn or in a building that had prior to that time been used as a chicken coop. One witness testified that in the month of February, for five or six days, he had taken care of the animal, which at that time was in the chicken coop tied to a post with a rope five or six feet long; that he pushed the feed and water to the animal with a rake as Mr. Brazeau had told him to watch the animal. Raymond Brown, who was an eye-witness to the accident, testified as follows:

"Mike (the plaintiff) was one side and Ed (Waitrovich) on the other. . . . He (the heifer) started rearing around; he jumped in the air. He made a lunge at Mike and he

went over and he leaped over him. I couldn't tell exactly what part of the animal struck Mike; he ran right toward him, right into him. . . . After striking Mike the animal traveled about ten feet. Ed was on the other side pulling the rope. Mike went down and Ed tied the heifer up. . . .

"The front part of the calf struck Mike. Waitrovich was hanging on the rope while the calf was jumping and pulling. When it was pulling its head was not headed toward Waitrovich. He (the heifer) turned around and went towards Mike. . . . He (the heifer) was rearing around; he didn't try to kick anybody—he made a lunge. He was kind of running around. They were holding her by the rope. . . . When they got down there she started running around good; she made a lunge at Mike."

Brazeau, an employee of Jenkins, who generally had the care of the animal, testified:

"She was a heifer about four or five hundred pounds between ten and eleven months old. At the time she had the accident, she was about ten or eleven months. . . . At the time that I went to work taking care of these cattle in November, 1930, the heifer was then about a mile and a quarter from his place along the river on company land. . . . I brought the animal up to the Jenkins farm from where it was. I used a cow. I led a cow and the calf followed the cow into the barn. . . . The next time I saw the heifer I guess was in December. . . . I was taking care of the cattle in December. I made a kind of a manger for the heifer. I used to give her hay in there. I let her have water all the time. . . . The heifer was in the chicken coop about two months. . . . I put water in a tin, a dishpan. She would tip the pail over. I would slip the dishpan in to her about four or five feet with anything I had hold of. Used to give her feed right up to her. . . . Put the water up to her because she was nervous. I did not want her to get any worse. . . . I guess I quit in April of 1931. . . . I told Chamberlain to feed and water the animal just the same as I had done."

The witness further testified that in April they moved the heifer from the chicken coop to the stable; that he and

another man had two ropes on her; that he led her out; that one of the ropes was attached to a post; that he put on two ropes because he was afraid she might break one; that they led her to the barn door and the two men tried to pull her in. Zaidel was there, and while the two men pulled, he pushed to assist them in getting the heifer into the barn. The witness further testified:

"The disposition of this animal was that she was nervous. I don't think there was anything else. It was real wild. She was from the woods you know. What made it wild was that she hadn't seen people much."

When examined in regard to the testimony given by Chamberlain, Brazeau said:

"I never had to use a pitchfork to keep the animal away from me. I never had to use a pitchfork in feeding the animal. I never had to keep it away with a rake. The reason I stated to Mr. Chamberlain that he should feed her that way was because her ropes weren't so good. I knew she would break the rope and he would have a hard time with her."

Zaidel testified that he assisted Martineau and Brazeau in getting the calf into the barn. He was there for the purpose of looking at the calf and to name the price which he would pay for it, which was $17.

We have stated the testimony most favorably to the plaintiff and outlined all that supports the plaintiff's case with respect to the vicious propensities of this animal. We are unable to find any evidence in this case which indicates anything more than that the animal resisted being led, was of Guernsey type, nervous and high-spirited. There is no evidence that the heifer ever hooked, butted, or struck with her feet any person at any time as the result of any vicious propensity. If she had any such propensity, there is nothing to indicate that the defendant Zaidel had any knowledge of it. There is no evidence that he knew anything more about

the animal than what was disclosed to him when he helped get her in the barn. The plaintiff sustained a serious injury, but he cannot recover from the defendants on account of such injuries unless the defendant Zaidel, who transacted the business, was in some way guilty of a want of ordinary care with respect to warning. The plaintiff knew more than Zaidel knew with respect to the characteristics of the animal in question,—that she was young, that she had been confined, that she had not been broke to lead, and that she jumped and was nervous. Knowing this, he continued in the employment. Zaidel could not therefore have been guilty of a want of ordinary care with respect to warning.

*By the Court.*—The judgment is reversed, and cause remanded with directions to dismiss the complaint.